**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                               **Criminal Case No.: 1:24-CR-51**
                                        **(JUDGE KLEEH)**

**JOHN PHILLIP RICHIE,**

      **Defendant.**

## <u>REPORT AND RECOMMENDATION, RECOMMENDING THAT DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 38] BE GRANTED</u>

Pending before the undersigned Magistrate Judge is a Motion to Suppress Evidence [ECF No. 38], filed by Defendant John Phillip Richie ("Defendant") on February 26, 2025. By Referral Order dated February 26, 2025 [ECF No. 39], the Hon. Thomas S. Kleeh, Chief United States District Judge, referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The Court also is in receipt of the Government's response in opposition to Defendant's motion, filed on March 10, 2025 [ECF No. 45]. The undersigned conducted a suppression hearing on Defendant's motion on March 28, 2025, at which the Court heard witness testimony, accepted exhibits into evidence, and heard the arguments of counsel.

Based on a detailed review of Defendant's motion and exhibits [ECF No. 38], the Government's response [ECF No. 45], the exhibits introduced into evidence at the hearing on Defendant's motion, and the witness testimony and argument of counsel given at said hearing, the undersigned **RECOMMENDS** that Defendant's motion be **GRANTED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant stands accused in a one-count indictment which a Grand Jury returned against him on September 4, 2024. [ECF No. 1].  Defendant is charged with Unlawful Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8).

On September 24, 2023, Star City Police Department Patrolman Jason Morgan ("Morgan") pulled into the parking lot of University Commons, an apartment complex located in Morgantown, West Virginia, to eat his lunch. Morgan observed an older, black, pickup truck with a white male, later identified as Defendant, inside, who appeared to be slumped in the driver's seat. Based upon this observation, Morgan decided to conduct a "welfare check" to determine the wellbeing of the driver of the vehicle.

After approaching the vehicle, Morgan knocked on the driver's side window and Defendant woke up. After the briefest of exchanges, Morgan, almost immediately, ordered Defendant to exit the vehicle and began conducting a Terry frisk. In response to Morgan's questioning, Defendant informed Morgan that he had a loaded magazine in his pocket. While searching for the magazine, Morgan discovered a baggie that contained what appeared to be a narcotic substance, later determined to be fentanyl. Morgan then placed Defendant in the back of his patrol vehicle while he searched the vehicle. Ultimately, Morgan recovered the magazine, a baggie of fentanyl, firearms, ammunition, and drug paraphernalia.

Defendant argues that all evidence obtained should be suppressed because Morgan conducted a warrantless search and seizure without reasonable and articulable suspicion. Furthermore, Defendant argues that statements made should be suppressed because Morgan failed to provide prior Miranda warnings. The Government argues that Morgan had reasonable suspicion to conduct the Terry stop based on the totality of the circumstances. In addition, per the

Government, <u>Miranda</u> warnings were not necessary because Morgan's questioning did not rise to the level of formal interrogation.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

### A. Witnesses and Exhibits from Suppression Hearing

During the aforementioned suppression hearing on March 28, 2025, the Court heard sworn testimony from one witness, Morgan. And the Court received into evidence the following [ECF No. 48]:

1.   Government's Exhibit #1, being Morgan's Star City Police Narrative Report.[1]

2.   Defendant's Exhibit #2, being a thumb drive containing Morgan's bodycam footage.

### B. Morgan's Testimony

The Government called Morgan to testify. According to his testimony,[2] Morgan testified that on September 24, 2023, he was employed as a law enforcement officer with the Star City Police Department. [9:02:33 to 9:03:20]. He currently is employed with the Star City Police Department on a part time basis. <u>Id</u>.

Prior to working for the Star City Police Department, Morgan was a deputy sheriff with the Monongalia County for 15 years. [9:03:27 to 9:04:27]. As a road deputy for 15 years, Morgan dealt with a wide variety of calls, including numerous overdoses. <u>Id</u>. Five years ago, Morgan was chosen to join the Monongalia County Quick Response Team responding to the overdose epidemic in the locale.  <u>Id</u>. He is also a certified instructor in the administration of naloxone and the detection

---

[1] Government's Exhibit A is the same "Exhibit 3" attached to Defendant's motion to suppress. [ECF No. 38-3, at 2].

[2] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on March 28, 2025, which is located on the section of the Court's intranet site for FTR recordings.

of overdoses. Id. In sum, Morgan testified that he has more training than the average law enforcement officer as it relates to drug overdoses. Id. He also has a long history of emergency medical services ("EMS") experience. [9:08:52 to 9:08:57].

On September 24, 2023, Morgan was nearing the end of his shift when he pulled into the back parking lot of University Commons in Star City to eat his lunch. [9:04:25 to 9:05:31]. He noticed an older model truck sitting off to the side. Id. Morgan noted that it was not uncommon for individuals to use and sell narcotics in the University Commons area. Id. He further testified that there have been drug busts in that area, which he became aware of throughout his years of experience and by hearing calls on the radio. Id.

Morgan was not sure what was going on, so he turned around and drove over to the vehicle. [9:05:35 to 9:07:05]. When Morgan approached the vehicle, he saw a male, later identified as Defendant, face downward towards the steering wheel and the vehicle was running. Id. Based upon his prior experience in dealing with overdoses, he assumed Defendant had overdosed and was deceased. Id. Thus, Morgan attempted to determine if Defendant was indeed overdosing and may need naloxone or if he was deceased. Id. He knocked on the vehicle's window several times and Defendant woke up. Id. Morgan then had Defendant exit the vehicle so that he could determine what was going on. Morgan testified that he was not conducting a criminal investigation. Id.

Morgan explained that Defendant's vehicle was running and, under state law, he was operating a motor vehicle. [9:21:02 to 9:21:10].

Morgan was concerned that Defendant was under the influence. [9:21:15 to 9:21:37]. When Defendant woke up, he appeared "surprised and disoriented;" thus, Morgan instructed Defendant to exit the vehicle to ensure he was not impaired while operating a vehicle. Id.

After Defendant exited the vehicle, Morgan conducted a <u>Terry</u> frisk; the <u>Terry</u> frisk, Morgan asked Defendant whether there was anything on his person. [9:07:06 to 9:07:43]. The suspect informed Morgan that he had a loaded magazine in his pocket and Morgan began to pat him down to find the magazine. <u>Id</u>. Due to officer safety issues, Morgan assumed Defendant likely had a loaded firearm on him as well. <u>Id</u>.

Morgan testified that he quickly put Defendant in handcuffs and detained him because of the officer safety concerns with finding the loaded magazine. [9:07:43 to 9:08:19]. He believed he saw something in the seat and when he removed the loaded magazine from his pocket, he saw a baggie that appeared to contain narcotics. <u>Id</u>.

When questioning Defendant, Morgan asked a variety of questions to get a sense of what was going on and why he was there, including what amount of drugs was in the bag. [9:08:59 to 9:09:30].

The contents of the baggie were field tested and determined to be approximately 10 grams of fentanyl. [9:09:33 to 9:10:00].

On cross-examination, Morgan confirmed that he did not go to University Commons in response to a call, but rather, he went there to patrol and eat his lunch. [9:10:36 to 9:11:20]. He testified that this occurred between 2:00 p.m. and 4:00 p.m. It was not particularly cold and was sprinkling rain. <u>Id</u>.

Morgan testified that although the University Commons is an upscale apartment complex for the area, it is also an area of frequent drug activity. [9:22:11 to 9:23:28]. For example, the local drug task force has had drug busts in that area, including in the parking lot. <u>Id</u>. However, the drug activity in this area is not higher than other areas in the locale.

5

The undersigned inquired as to nature of the welfare check. [9:13:05 to 9:15:32]. Morgan explained that he was conducting a welfare check when he knocked on the window and ordered Defendant out of the vehicle. Id. More specifically, the location and condition of the vehicle mirrored that of vehicles that are typically involved in suspicious activities. Id. The University Commons is a fairly upscale apartment complex, and the vehicle was parked in a maintenance area of the parking lot. Id. In addition, it is not uncommon for an individual who has overdosed to be faced down in the steering wheel. Id.

Morgan testified that he could not smell any suspicious odor, insofar as the window was only partially cracked. [9:16:40 to 9:17:11].

Based on Morgan's past experience and training, a sign that an individual may have overdosed or under the influence of controlled substances include being face down in a vehicle and having to knock a couple of times to wake the individual up. [9:17:14 to 9:17:35].

Morgan testified that he typically would have a suspect exit the vehicle to determine what is going on. [9:17:40 to 9:18:27]. Morgan noted that doing so prevents a suspect from accessing a weapon. Id.

### III. LEGAL ISSUES & ANALYSIS

Defendant's contention is that Morgan lacked reasonable suspicion to seize Defendant for a Terry frisk. Thus, any evidence seized as a result of the Terry frisk should be suppressed. Additionally, Defendant contends that Defendant was not provided with a Miranda warning prior to being custodially interrogated; thus, any statements Defendant gave to Morgan regarding drugs on his person or firearms in his vehicle should be suppressed. On the other hand, the Government argues that Morgan had reasonable, articulable suspicion to conduct a Terry frisk of Defendant given Morgan's observations of Defendant and the vehicle in which he was located. Additionally,

6

the Government argues that any statements made to Morgan about the drugs on Defendant's person or firearms in Defendant's vehicle were not made while Defendant was in custody, such that there is no <u>Miranda</u> issue.

The threshold issue here is whether Morgan had reasonable suspicion that Defendant was engaged in criminal activity when Morgan conducted the <u>Terry</u> frisk. The undersigned **FINDS** that Morgan did <u>not</u> have reasonable suspicion to conduct the <u>Terry</u> frisk. Additionally, even if Morgan's search of Defendant was lawful, Morgan failed to appropriately provide Defendant with a <u>Miranda</u> warning prior to Defendant making incriminating statements about the drugs on his person and firearms in his vehicle.

## A. Legal Principles

The undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Further, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" <u>Mincey v. Arizona</u>, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). It is the Government's burden to demonstrate that one of these exceptions applies. <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 455 (1971).

Among those few exceptions to the requirement to obtain a warrant is the circumstance where the officer has reasonable suspicion that criminal activity "may be afoot." <u>U.S. v. Sokolow</u>, 490 U.S. 1, 7 (1989) (citing <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). In assessing reasonable suspicion, courts "assess the relevant facts known to the authorities and decide whether those facts,

'from the standpoint of an objectively reasonable police officer,' give rise to reasonable suspicion." U.S. v. Singh, 363 F.3d 347, 354 (2004) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996). Reasonable suspicion determinations do "not depend on any single factor, but on the totality of the circumstances." Id. However, the facts known to authorities must be more than a mere "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27. "[A]n officer's subjective intent in conducting a *Terry* stop is irrelevant." U.S. v. Foster, 824 F.3d 84, 91 n. 5 (4th Cir. 2016) (citing Whren v. U.S., 517 U.S. 806, 812-813 (1996); U.S. v. Branch, 537, F.3d 328, 337 (4th Cir. 2008)).

Additionally, the inevitable discovery exception applies to unconstitutional searches and "allows for the admission of evidence that would have been discovered . . . without [an] unconstitutional source." Utah v. Strieff, 579 U.S. 232, 238 (2016) (citing Nix v. Williams, 467 U.S. 431, 443-444 (1984). Such evidence can be admitted under the inevitability discovery exception only "'[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" U.S. v. Thomas, 955 F.2d 207, 209 (4th Cir. 1992) (citing Nix, 467 U.S. at 444). An inevitable discovery "must 'arise from circumstances other than those disclosed by the illegal search itself.'" Thomas, 955 F.2d at 210-11 (citing U.S. v. Boatwright, 822 F.2d 862, 864-65 (9th Cir. 1987).

Furthermore, the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates that use of procedural safeguards effective to secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Defendants are entitled to Miranda protections if their freedom is limited by police "to a 'degree associated with formal arrest.'" U.S. v. Sullivan, 138 F.3d 126, 130 (4th Cir. 1998) (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).

Finally, well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its 'substantial social costs.'" Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### B.  Analysis

In the case at bar, Morgan's search and seizure of Defendant was not supported by reasonable, articulable suspicion. There were no articulable facts beyond a mere hunch that would have warranted a reasonable officer in believing that Defendant was engaged in criminal activity and, thus, subject to a Terry search. Additionally, had Morgan not performed a Terry search on Defendant, the evidence in question would not have inevitably been found. Thus, the search and seizure of Defendant unconstitutionally violated the Fourth Amendment's protection against unreasonable searches and seizures, such that evidence obtained thereby should be suppressed. Finally, Morgan failed to provide the required Miranda warning to Defendant. Evidence seized because of the Terry frisk and Defendant's statements to Morgan should therefore be suppressed.

> 1.  *Morgan did not have reasonable, articulable suspicion that warranted him in conducting a Terry frisk on Defendant.*

The issue here is whether Defendant's head being down in his car, while parked in a private parking lot with the engine running, gave rise to reasonable, articulable suspicion that criminal activity was afoot such that Morgan was justified in seizing Defendant by ordering him out of the car.

Officers may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." Sokolow, 490 U.S. at 7 (citing Terry, 392 U.S. at 30. Reasonable

9

suspicion determinations do "not depend on any single factor, but on the totality of the circumstances." Id., at 8. However, the articulable facts must be more than a mere "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27. In assessing reasonable suspicion, courts "assess the relevant facts known to the authorities and decide whether those facts, 'from the standpoint of an objectively reasonable police Morgan,' give rise to reasonable suspicion." Singh, 363 F.3d at 354 (citing Ornelas, 517 U.S. at 696).

The Government concedes that Morgan conducted a Terry stop when Morgan ordered Defendant out of the car. [ECF No. 45, ¶ 5]. Morgan's police report notes that, prior to conducting a Terry frisk of Defendant, the Morgan "observed a white male in an older black pickup truck, slumped into the steering wheel," [Government's Exhibit No. 1, Star City Police Report], in a "somewhat secluded area of a parking lot at an apartment complex." [ECF. No 45, ¶ 2]. Morgan testified that he believed Defendant had overdosed, particularly based on his experience as an officer and EMS responder. [9:03:39 to 9:04:24]; [9:08:52 to 9:08:57].  Thus, at the very outset, it appears that Morgan's response might best be characterized as a "wellness check."

However, almost immediately upon approaching the vehicle, the encounter became something other than a wellness check. In viewing the body camera footage, upon approaching the vehicle, Morgan very quickly exited his patrol vehicle and "knocked on the window of the truck until the male woke up," [Government's Exhibit No. 1, Star City Police Report], which was approximately two seconds after Morgan's initial knock on the window. [Body Cam, at 0:46-48]. In the undersigned's review of the body camera footage, the suspect (i.e. Defendant) did not seem intoxicated or otherwise incapacitated when he woke up. [Body Cam, at 0:50 – 1:00]. The Government does not point to a particular moment at which Morgan had reasonable, articulable suspicion that criminal activity was afoot. [ECF No. 45, ¶ 5] (stating that "[a]t some point,

10

Patrolman Morgan believed criminal activity was afoot."). Then, Morgan "had the male turn the truck off and exit the vehicle" before "conducting a Terry frisk." [Government's Exhibit No. 1, Star City Police Report].

At oral argument, the Government argued that additional facts supported the contention that Morgan had reasonable suspicion to conduct the Terry frisk. First, Morgan noted that the area Morgan found Defendant was, in his experience as an officer and in his role as an EMS responder, a common place where people would go to use narcotics. [9:05:08 to 9:05:31]. However, later during the hearing, Morgan conceded that area where he found Defendant did not have drug activity at a higher rate than any other apartment complex in Morgantown. [9:22:49 to 9:23:06]. Though Morgan did not testify about details of the vehicle's interior, he noted "the location of the vehicle, interior of the vehicle . . . everything seemed out of place." [9:13:29 to 9:14:04] Morgan also noted that the type and condition of vehicle – "older" and "beat up" – was not common for the area in which it was parked. [9:14:48 to 9:15:17]. Morgan noted that he was not "profiling" the vehicle as being one owned by low-income individuals. Id.

Under the totality of the circumstances, the undersigned finds that Morgan did not have reasonable, articulable suspicion to conduct the Terry frisk. The facts, taken as a whole, would not warrant that a reasonable officer suspect that criminal activity was afoot. In essence, Morgan saw a man sleeping in a running car. A reasonable officer would not conclude, without more, that an individual sleeping in his parked car in a private parking lot was committing a crime.[3] In fact, Morgan himself characterized his approach to the vehicle as a "welfare check."

---

[3] Indeed, according to the National Highway and Transportation Safety administration, people are encouraged to "stop and take a short nap" to avoid drowsy driving. NHTSA, United States Dept. of Transportation, Drowsy Driving (Last visited March 31, 2025), https://www.nhtsa.gov/risky-driving/drowsy-driving.

11

During the argument portion of the Motion Hearing before the undersigned, the Government argued that Defendant technically was "operating" the vehicle under the law, insofar as the engine was running, so Morgan had reasonable suspicion that Defendant was operating the car while intoxicated. [9:24:25 to 9:25:40]. But even if Defendant was operating the vehicle under West Virginia law, simply being asleep in the car as Defendant was did not give rise to reasonable suspicion that criminal activity was afoot. The Government points to no other articulable facts that might have suggested criminal activity was afoot. For example, Morgan observed no moving vehicle violations (aside from the Government's claim that Defendant was operating the vehicle illegally). There was no call for service by a third party. No tipster provided information that a crime was occurring or would occur. No confidential informant indicated that Defendant was engaging in criminal activity. There was no "be on the lookout" notice for a vehicle matching Defendant's or for a person matching Defendant's description. The owner of the property on which Defendant was located did not call for help or express any concern. There was no independent request for a welfare check. Morgan did not observe suspected drug activity like a hand-to-hand transaction or persons meeting briefly and then parting ways. Morgan did not observe furtive looks or glances from Defendant, or perceive that Defendant was trying to steer clear of him or otherwise avoid detection by law enforcement. Morgan did not smell marijuana as he approached Defendant's vehicle, nor did he smell alcohol or detect any other odor of concern.

While observing an individual's head down in a running car might warrant a welfare check, this by itself does not create reasonable, articulable suspicion that criminal activity is afoot. Defendant woke up and was responsive almost immediately after Morgan knocked on Defendant's window. Defendant was attentive when he woke up and alertly responded to the Morgan's

questions. At this point, even if Morgan did have reasonable suspicion of criminal activity, a reasonable officer's suspicion would have been dispelled.

Morgan testified that the area in which he saw Defendant was known for drug activity. However, an individual's presence in a high crime area (such as an area where people typically use illegal substances) is "among the relevant contextual considerations in a Terry analysis" but it is not enough by itself "to support a reasonable, particularized suspicion of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citing Adams v. Williams, 407 U.S. 143, 144, 147-148 (1972)). Regardless, Morgan acknowledged that the rate at which narcotics were used in the apartment complex where Defendant was found was not higher than in any other apartment complex the locale. Therefore, Defendant was not in an area that had higher than usual drug activity.

At bottom, the undersigned **FINDS** that Morgan did not have reasonable suspicion to order Defendant out of the car merely because Defendant's head was down while in his car and while his car was running in a private parking lot.

> 2. *Morgan would not have inevitably discovered Defendant's invalid license plates.*

The Government argues that Morgan inevitably would have discovered that the license plate on Defendant's vehicle was invalid, such that the evidence was lawfully seized. Thus, the issue here is whether Morgan would have inevitably run a search on Defendant's license plates, discover they were invalid, and performed a traffic stop which would have led to the discovery of the evidence at hand.

The inevitable discovery exception to the Fourth Amendment "allows for the admission of evidence that would have been discovered . . . without [an] unconstitutional source." Strieff, 579 U.S. at 238 (2016) (citing Nix, 467 U.S. at 443-444). Such evidence can be admitted under the

13

inevitable discovery exception only "'[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" Thomas, 955 F.2d at 209 (citing Nix, 467 U.S. 431 at 444). An inevitable discovery "must 'arise from circumstances other than those disclosed by the illegal search itself.'" Thomas, 955 F.2d, at 211 (citing Boatwright, 822 F.2d 862). "[W]hen evidence could not have been discovered without a subsequent search, *and* no exception to the warrant requirement applies, *and* no warrant has been obtained, *and* nothing demonstrates that the police would have obtained a warrant absent the illegal search," the inevitable discovery doctrine does not apply. U.S. v. Allen, 159 F.3d 832, 841 (4th Cir. 1998) (emphasis in original).

The Government argues that the initial encounter with Defendant was a welfare check, [ECF No. 45, ¶ 8], "totally divorced from detection, investigation, or acquisition of evidence relation to the violation of a criminal statute" as required under the law. U.S. v. Marshall, 747 Fed. App'x 139, 144 (4th Cir. 2018) (citing Cady v. Dombrowski, 413 U.S. 433, 441 (1973)) (internal citations omitted). Morgan began looking through Defendant's car window, [Body Cam, 0:40], before knocking on Defendant's car window seven seconds later. [Body Cam, 0:47]. Defendant immediately woke up from Morgan's knocks on the car window. [Body Cam, 0:47]. The Government concedes that "what began as a welfare check quickly turned into a criminal investigation," [ECF No. 45, ¶ 10], when Morgan immediately ordered Defendant to exit his vehicle, approximately 20 seconds after the Morgan began looking through Defendant's car window. [Body cam, 1:00].

After Defendant asks what he has done wrong and exits the vehicle, Morgan asks Defendant whether he "has anything on" him. [Body Cam, 1:07-1:16]. As Defendant began to reply, stating "just uh…" Morgan lightly grabbed Defendant by the right arm and pointed

14

Defendant to the back of the vehicle. [Body Cam, 1:17]. As Morgan was leading Defendant to put his hands on the rear of the car, Defendant informed Morgan that he had a knife and "pistol clip" on him. [Body Cam, 1:17-18]. Morgan lightly led Defendant to put his hands on the rear of the car and conducted a Terry frisk. [Body Cam, 1:20].

Defendant argues that Morgan seized Defendant when he ordered Defendant out of the car. [ECF No. 38, 4]. Defendant further argues that this seizure was unconstitutional because sleeping in one's car fails to meet a "particularized and objective basis for suspecting" that Defendant was engaged in "criminal activity," U.S. v. Cortez, 449 U.S. 411, 417 (1981).

The Government argues that, notwithstanding whether Morgan's ordering of Defendant to exit his vehicle was an unconstitutional seizure under the Fourth Amendment, Morgan would have nonetheless inevitably run a search on and discovered the invalid license plate on Defendant's vehicle. [9:28:44 to 9:29:24]. This, the Government argues, would have inevitably led to Morgan ordering Defendant out of the vehicle. Id.

Here, the undersigned finds that the inevitability exception does not apply. The Government has not shown, by a preponderance of the evidence, that Morgan would have inevitably or ultimately run a search on Defendant's license plates had the interaction ended prior to the Morgan ordering Defendant out of the car or had the interaction been merely a welfare check. The Government proffers no established policy or routine procedure that law enforcement runs the license plates in a community caretaking context. See Colorado v. Bertine, 479 U.S. 367, 371-376 (1987) (stating that deference is provided to "police caretaking procedures designed to secure and protect vehicles and their contents within policy custody." (citations omitted)). Thus, there is no procedural reason that suggests Morgan would have run a search on Defendant's license plates to discover that they were invalid.

Second, the Government's contention that the initial interaction with Defendant was purely divorced from any investigatory function and only a welfare check does not support the argument that Morgan would have run Defendant's license plate. In fact, it contradicts that conclusion. If the initial interaction was, as the Government argues, to merely check on the welfare of Defendant, it does not stand to reason that the Morgan would have run a search on Defendant's license plates after discovering that Defendant was healthy and not experiencing a medical emergency.

The totality of the circumstances discussed above does not support that notion that Morgan would have inevitably run a search on Defendant's license plates and discovered that they were invalid. Thus, Morgan would not have inevitably or ultimately conducted a traffic stop on Defendant that would have led to Morgan's discovery of the evidence at hand. Thus, the undersigned **FINDS** that the inevitability doctrine does not apply, and the evidence at issue should be suppressed.

### 3. Defendant's _Miranda_ rights were violated.

The issue here is whether Defendant should have been provided a Miranda warning prior to making his statements about the drugs on his person and firearms in his vehicle.

In Miranda, "the Court concluded that in the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination." Rhode Island v. Innis, 446 U.S. 291, 297 (1980) (citing Miranda, 384 U.S. at 444). "[T]he safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer, 468 U.S. at 440 (citing Beheler, 463 U.S. at 1125). "The operative question is whether, viewed objectively, a 'reasonable man in the suspect's position would have understood his

16

situation' to be one of custody.'" U.S. v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007) (citing Berkemer, 468 U.S. at 422).

The Government argues that Defendant "spontaneously offered every statement he made, not in response to any questions that rise to the level of interrogation, but for his own purpose, apparently seeking leniency from Patrolman Morgan." [ECF No. 45, ¶ 18]. On the other hand, Defendant argues that he "was in custody when Patrolman Morgan placed handcuffs on Richie. . . . there is little doubt [Defendant's] statements about the drugs on his person and statements . . . regarding firearms located in the vehicle, were made in response to police interrogation." [ECF No. 38, at 5].

Here, even if Morgan had reasonable suspicion to conduct the Terry search, Defendant was in custody when the statements in question were made. Thus, Morgan failed to give a Miranda warning to Defendant. More to the point, Morgan placed Defendant in handcuffs after conducting a Terry frisk and told him that he was going to "detain" him "for a minute". [Body Cam, 2:00 – 2:25]. Morgan told Defendant that "you're not going to jail, I promise you." [Body Cam, 2:10]. Defendant responded, "yes I am because I've got a warrant." [Body Cam, 2:12]. Defendant told Morgan "that pistol, man. I'm a felon already, somebody left it in my truck." [Body Cam, 3:28]. Morgan placed Defendant into his vehicle. [Body Cam, 4:00]. Morgan asked Defendant where the firearm was. [Body Cam, 5:33]. Morgan then got Defendant out of the car and performed a more thorough search. [Body Cam, 5: 50]. Morgan found a baggie and drug paraphernalia in Defendant's pants and asked "how much dope you have in there, in that bag? What is that?" [Body Cam, 6:00]. Defendant responded, "I have no idea." [Body Cam 6:08]. Morgan then asked Defendant "is there fentanyl in it? Am I going to fucking fall out here in a minute?" [Body Cam,

17

6:11]. Defendant responded "probably." Morgan then further questioned and searched Defendant and his vehicle.

A reasonable person would have understood their situation to be one of custody when Defendant was initially placed into handcuffs practically immediately after being ordered out of the vehicle. Though Morgan promised Defendant that he would not be going to jail, Defendant was in handcuffs, knew he was a felon, knew he should not have a gun because of his status as a felon, and had illegal substances on his person. He stated that he was going to prison. Any reasonable person would have understood their situation at that point to be one of custody. Additionally, Defendant's statements were all made in response to Morgan's questioning while Defendant was in custody. Thus, Morgan should have provided Defendant with a Miranda warning prior to asking Defendant questions. Any information given to Morgan by Defendant regarding the drugs on Defendant's person and firearms in Defendant's vehicle are inadmissible.

Thus, the undersigned **FINDS** that Morgan failed to provide Defendant with a Miranda warning, such that the resulting evidence at issue should be suppressed.

### IV.    CONCLUSION

For the reasons set forth herein, the undersigned **FINDS** that there was no reasonable suspicion to seize or conduct a search on Defendant and that Defendant was not given a required Miranda warning. The undersigned **RECOMMENDS** that Defendant's Motion to Suppress [ECF No. 38] be **GRANTED**.

Any party shall have fourteen (14) days from the date of service of this Report and Recommendation to file with the Clerk of the Court **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  A copy of such objections should also be submitted to the United States District

Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted April 11, 2025.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE