IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

       Plaintiff,

  v.                              CRIMINAL NO. 1:24-CR-51
                                          (KLEEH)

JOHN PHILLIP RICHIE,

       Defendant.

## MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]

Pending before the Court is a Report and Recommendation ("R&R") by the Magistrate Judge recommending that the Court grant Defendant's motion to suppress. For the reasons discussed herein, the R&R is **ADOPTED IN PART** and **REJECTED IN PART**, and the motion to suppress is **GRANTED**.

## I.    BACKGROUND

On September 4, 2024, the grand jury returned a one-count Indictment charging Defendant John Phillip Richie ("Defendant") with Unlawful Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Specifically, Defendant is charged with the unlawful possession of (1) a Diamondback Arms INC, semi-automatic rifle, model DB-15, 223/5.56 caliber, serial number DB-1809668, and (2) a SCCY Industries, LLC, semi-automatic pistol, model CPX-2, 9mm caliber, serial number 308978. According to the

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Indictment, Defendant is prohibited from possessing firearms due to a previous felony conviction. The two firearms at issue were seized during Defendant's encounter with law enforcement on September 24, 2023. Defendant has moved to suppress all evidence seized that day, arguing that it was obtained in violation of the United States Constitution. The Court referred the motion to suppress to the Magistrate Judge, who held a hearing and entered an R&R recommending that the motion be granted. The Government timely filed objections to the R&R.

## II. FACTS

The Court finds the following facts based on the testimony and arguments at the suppression hearing, the parties' briefs, and the exhibits to the hearing and briefs.

On September 24, 2023, Jason Morgan ("Morgan") was a police officer with the Star City Police Department in Star City, West Virginia. That day, Morgan drove his cruiser into the parking lot of University Commons, an apartment complex in Star City, to eat his lunch. The parking lot is clearly marked as private property. Morgan observed an older, black pickup truck with a white male — later identified as Defendant — inside. Defendant appeared to be slumped forward in the driver's seat with his face on the

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

steering wheel.  Based on this observation, Morgan decided to conduct a "welfare check" on Defendant.

Morgan parked parallel to the truck and exited the police cruiser.  He walked to the driver's side door of the truck and knocked forcefully on the window.  The truck was running, and it was apparent that there was no handle on the outside of the driver's side door.  Defendant woke up, lifted his head, and looked up at Morgan.  When Defendant lifted his head, he did not appear to be under the influence of drugs or alcohol.  Rather, he appeared to have been abruptly woken from sleep.  In a stern tone, Morgan immediately said, "Open the door."  He repeated the command twice, getting louder each time.  Defendant proceeded to open the door.  Approximately seven seconds passed between the first directive to open the door and the opening of the door.  After the door was opened, Morgan said, "What's goin' on?"  Defendant said, "I was just sittin' here for a minute."  Morgan said, "Step out of the vehicle for me.  Shut it off."  Defendant responded, "What did I do wrong?"  Morgan repeated, "Just step out for me."

After Defendant was out of the vehicle, Morgan asked him, "Do you have anything on you?"  Defendant responded that he had a "knife and a pistol clip."  Morgan proceeded to conduct a pat-down of Defendant.  While patting him down, Morgan asked Defendant,

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

"What do you got a magazine for?" Defendant replied, "My buddy's pistol's in the truck." Morgan asked, "Where at?" Defendant told him that it was in the "front seat." Morgan removed multiple objects from Defendant's pockets. Defendant stated, "I was just sleeping. I was tired, man." Morgan told Defendant, "I'm just gonna detain ya for a minute," and he proceeded to place handcuffs on him.

Morgan said, "You ain't going to jail, okay? I promise you." Defendant responded, "Yes, I am — because I've got a warrant." Morgan asked Defendant his name, and Defendant told him his name. Defendant then said, "I just want to make it one week more for my daughter's birthday, and then I will turn myself in." Morgan asked, "Where's your ID at? Your wallet?" Defendant responded, "I don't have one. Well, I've got my prison ID in there." Morgan removed Defendant's wallet from his pants. As Morgan was looking at Defendant's ID, Defendant said, "The pistol, man. I'm a felon already, dude. Somebody left it in my truck." Morgan then directed Defendant to sit in the back seat of the cruiser, and he complied. The door of the cruiser was left open, and Defendant's legs were facing toward the outside. Morgan asked Defendant, "John, what were you in jail for?" He replied, "Grand larceny." Morgan asked Defendant if Morgan had ever arrested him before, and

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Defendant said that he did not think so.  Morgan directed Defendant to turn his legs inside the vehicle, and Defendant complied. Morgan again asked him, "Where is the firearm at?"  Defendant responded, "On the front passenger seat."  Morgan then closed the cruiser door.  Morgan opened the front passenger's side door of the cruiser, and Defendant can be heard saying something along the lines of, "My buddy had left it at my house, and I was trying to take it over to him . . . ."

Morgan then directed Defendant to exit the vehicle, and Defendant complied.  Morgan reached inside Defendant's pants pocket and pulled out a pipe and a baggie of what he suspected to be drugs.  Morgan asked Defendant, "How much dope do you have . . . in that bag right there?  What is that?"  Defendant responded, "I have no idea."  Morgan further asked, "Is there fentanyl in it?  Am I gonna f*ckin' fall out here in a minute?" Defendant said, "Probably fentanyl."  Morgan proceeded to remove more objects from Defendant's pockets, including a pocketknife and cash.  Defendant said that he does not "even do dope" and that "meth" is his "thing."  Morgan asked Defendant where he got "it" (the baggie).  Defendant told him that he got it "right over here," in one of the apartments.  Morgan directed Defendant to sit in the cruiser again, and he complied.  Morgan placed the pipe and baggie

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

in the front passenger's seat of the cruiser.  He called for assistance due to a possible fentanyl exposure.  Morgan then lifted and dug through various objects on the front passenger's seat of Defendant's truck, including a pistol.  Backup arrived soon thereafter.

Morgan and another officer continued to investigate.  At one point, seemingly in response to a cue from Defendant, Morgan opened the door and said, "Yeah?"  Defendant said, "Can you do me one favor?  I know I'm going to jail and sh*t.  Can I just please call my old lady?"  Morgan said, "Yeah.  I'll let you make a phone call and I'll get you a cigarette here in a minute."  Morgan shut the door again but soon returned to the cruiser to open the door and ask Defendant, "John, where'd you get this truck?"  Defendant replied, "From my old lady's father."  Morgan asked, "Who's he?"  Defendant could not remember his full name.  Morgan said, "How long have you had it?"  Defendant said, "Over a year . . . about six to eight months."  Morgan told Defendant that the license plate was coming back as stolen.  Defendant said that he got the plate from one of his buddies.  Morgan then shut the door, and Defendant called out to say, "There might be some meth in the center console — I'm not sure."  Another officer arrived.  Morgan found Narcan on Defendant's front passenger seat.  After searching the

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

truck more and interacting with the other officers, Morgan returned to Defendant and asked him, "Where'd you say the meth was?" Defendant replied, "I don't think there is any." Morgan asked, "How much dope's in this bag here?" Defendant replied, "I have no idea, I swear to God." Another officer arrived. Morgan then removed a scale from Defendant's front passenger seat. He asked Defendant, "How's this scale work?" Defendant explained it to him. Morgan weighed the baggie of suspected drugs. One of the officers walked around Defendant's truck with a canine. Morgan announced to the other officers that the baggie weighed 9.3 grams. The officers were then advised over the radio that Defendant had an active capias.

The officers continued to search the truck. Morgan then opened the back door to the cruiser and, again, seemingly in response to a cue from Defendant to come over, asked, "What's up?" Defendant said, "There's an AR-15 in that backpack that belongs to a woman up in Preston County. Her son sold it to me, and I was gonna give it back to her. She was gonna buy it from me." The officers then removed a large bag from the truck and removed an AR-15 from the bag. They also located another set of scales. At

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

no point during the described interaction did any officer provide
Defendant with Miranda warnings.[1]

### III. REPORT AND RECOMMENDATION AND OBJECTIONS

Defendant argues that Morgan lacked reasonable suspicion to
conduct a Terry frisk, and any evidence seized as a result of the
frisk should be suppressed.  Defendant also argues that he was not
provided with Miranda warnings prior to a custodial interrogation,
so any statements he gave to Morgan regarding drugs on his person
or firearms in his vehicle should be suppressed.  The Government
argues that Morgan had reasonable suspicion to conduct the Terry
frisk.  It also argues that Miranda warnings were not required
because the questioning of Defendant did not rise to the level of
formal interrogation, and any statements Defendant made were not
while he was in custody.

The Magistrate Judge agreed with Defendant's position,
finding that Morgan did not have reasonable suspicion to conduct
the Terry frisk and that Defendant's statements should be
suppressed due to Morgan's failure to provide Miranda warnings.
The R&R stated that the parties had 14 days from service of the
R&R to file "specific written objections, identifying the portions

---

[1] Defendant was mirandized later, after the officers found what
they believed to be stolen mail in Defendant's truck.

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

of the Report and Recommendation to which objection is made, and the basis of such objection." The Government timely filed objections, objecting to a number of findings in the R&R. Defendant also filed a response to the objections.

When reviewing a magistrate judge's R&R, the Court must review _de novo_ only the portions to which an objection has been timely made. 28 U.S.C. § 636(b)(1)(C). Otherwise, "the Court may adopt, without explanation, any of the magistrate judge's recommendations" to which there are no objections. _Dellarcirprete v. Gutierrez_, 479 F. Supp. 2d 600, 603–04 (N.D.W. Va. 2007) (citing _Camby v. Davis_, 718 F.2d 198, 199 (4th Cir. 1983)). Courts will uphold portions of a recommendation to which no objection has been made unless they are clearly erroneous. _See_ _Diamond v. Colonial Life & Accident Ins. Co._, 416 F.3d 310, 315 (4th Cir. 2005). Given the breadth of the Government's objections, the Court will conduct a _de novo_ review of the R&R.

### IV. DISCUSSION

For the reasons discussed below, the Court finds that Morgan lacked the requisite reasonable suspicion to order Defendant to exit the truck. The Court, however, finds that Morgan did not otherwise violate Defendant's _Miranda_ rights with respect to the challenged incriminatory statements. Given the need to deter law

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

enforcement from engaging in similar behavior, the Court finds

that all evidence seized during the encounter must be suppressed.

**A.   Morgan lacked the requisite reasonable suspicion to order
Defendant to exit the truck.**

The Fourth Amendment to the United States Constitution

provides,

> The right of the people to be secure in their
> persons, houses, papers, and effects, against
> unreasonable searches and seizures, shall not
> be violated, and no Warrants shall issue, but
> upon probable cause, supported by Oath or
> affirmation, and particularly describing the
> place to be searched, and the persons or
> things to be seized.

U.S. Const. amend. IV.  A police officer may interact with an

individual without necessarily seizing that individual.  See

Florida v. Bostick, 501 U.S. 429, 434 (1991) (citations omitted).

For example, "law enforcement officers do not violate the Fourth

Amendment by merely approaching an individual on the street or in

another public place, by asking him if he is willing to answer

some questions, by putting questions to him if the person is

willing to listen, or by offering in evidence in a criminal

prosecution his voluntary answers to such questions."   Id.

(citations omitted).  As the Supreme Court has explained, an

additional show of force is required for an interaction to

constitute a seizure:

MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]

> [A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free "to disregard the police and go about his business," California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991), the encounter is consensual and no reasonable suspicion is required.  The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.  The Court made precisely this point in Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

Id.  "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  Id. at 439.  When a law enforcement officer does conduct a warrantless seizure by conducting a "brief investigatory stop[] . . . that fall[s] short of traditional arrest," he has complied with the Fourth Amendment if his "action is supported by reasonable suspicion to believe that criminal activity may be afoot[.]"  United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks and citations omitted).

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Here, the Court finds that Defendant was seized when Morgan ordered him to exit the truck.  Considering all the circumstances surrounding the encounter, Morgan's conduct would have communicated to a reasonable person that he or she was not free to decline Morgan's requests or otherwise terminate the encounter. Defendant had just been sleeping in his truck.  He was awoken by Morgan's forceful rapping on his window.  Sleepy and confused, Defendant looked up at Morgan.  Morgan immediately said, "Open the door."  The tone of Morgan's voice was stern.  His request was not optional.  He did not say, for example, "Would you mind opening the door?"  He did not say, for example, "Would you be willing to answer some questions?"  He did not tell Defendant that he could decline the request.  Rather, he said (three times), "Open the door."[2]  When Defendant attempted to ask questions, Morgan instructed him to exit the vehicle and turn the vehicle off. Again, Morgan did not, for example, ask Defendant, "Would you mind exiting the vehicle?"  He did not, for example, ask Defendant,

_____

[2] It is well-established that if a law enforcement officer has lawfully stopped a vehicle, the officer may order the driver out of the vehicle.  See Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").  Here, of course, there was no traffic stop.  Defendant's vehicle was already parked when Morgan approached.

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

"Would you be willing to speak with me?"  Morgan was forceful, clear, and commanding.  Defendant was seized when he exited the truck.

Having found that Defendant was seized when he exited the truck, the Court must determine whether Morgan had reasonable suspicion to justify the seizure.  See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.") (citations omitted). Reasonable suspicion "defies precise definition." United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008).  In determining whether reasonable suspicion exists, courts "look to the totality of the circumstances." Id.  The Supreme Court has "counseled lower courts to give 'due weight' to the factual inferences drawn by police officers as they investigate crime[.]" Id. (citations omitted).  An officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). Reasonable suspicion must be grounded in specific and articulable facts, not a mere hunch.  See Arvizu, 534 U.S. at 274.  Law

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

enforcement "and the Government must do more than simply label a behavior as 'suspicious' to make it so." United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011).

### 1.    Overdose, Death, or Impairment

The Government asserts that Morgan had reasonable suspicion to remove Defendant from the truck because Morgan believed that Defendant was dead or under the influence of drugs or alcohol. Morgan testified about his history and training with respect to responding to drug overdoses. See Transcript, ECF No. 53, at 9:9-24.  He testified that when he saw Defendant's face slumped downward, he "assumed [Defendant] had overdosed."  Id. at 11:4-13.  Morgan testified that he was "getting ready to try to determine" whether Defendant had overdosed.  Id.  He testified that his intent when he approached Defendant's vehicle was "[t]o see if [he] could get [Defendant] awake and find out if he was overdosing and find out what was going on, why he was there."  Id. at 11:21-23.  He testified that he "had [Defendant] exit the vehicle . . . [to] find out what was going on."  Id. at 12:2-6. Morgan also testified that he approached Defendant's vehicle because he thought perhaps that Defendant was "deceased."  Id. at 13:19-21.

USA V. RICHIE                                                      1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

During the suppression hearing, the Magistrate Judge asked Morgan when the encounter stopped being a welfare check and morphed into a concern that criminal activity was afoot.  In response, Morgan testified, "Well, the first one was when I approach the vehicle and see a male face-down in the steering wheel.  That's not — that's not something that's — that's common.  In that area, it's sort of common for someone who's overdosing."  Id. at 17:21–18:6.  Morgan testified that he had previously encountered individuals under the influence of alcohol who were "face-down in their steering wheel."  Id. at 19:17-20.  He testified that Defendant seemed "surprised and somewhat disoriented" when he woke up, which would be "enough" for him to ask Defendant to exit and make sure that he is not an impaired driver operating a vehicle.  Id. at 24:14-25.  Morgan, however, testified that as he approached the vehicle, he was not conducting a criminal investigation:

> Q.  And then you got out of your vehicle and you went over to his vehicle.  And what was your intent at that point?
>
> A.  To see if I could get the individual awake and find out if he was overdosing and find out what was going on, why he was there.
>
> Q.  Okay.  So at that point you didn't have any — you weren't doing anything — like a criminal investigation in any way.
>
> A.  No.

15

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Id. at 11:19–12:1.

The Court is not persuaded by the Government's argument here. First, Morgan testified that he was not conducting a criminal investigation when he approached Defendant's vehicle. Second, even if he were, his proposed "articulable facts" are not sufficiently specific or convincing. If Morgan suspected that Defendant was under the influence of alcohol or drugs, which would have been reasonable when Defendant's head was slumped forward, the suspicion should have been eliminated when Defendant woke up and looked up at Morgan. As the Court has already found, Defendant did not appear to be under the influence of drugs or alcohol when he lifted his head. He appeared to be someone who had been abruptly woken from sleep. Accordingly, the Court finds that reasonable suspicion based on suspected overdose, death, or impairment did not exist.

**2.    Drug Activity at University Commons**

To the extent the Government argues that a history of drug activity in the University Commons parking lot supports reasonable suspicion, the Court rejects this argument. Morgan testified that it was "not uncommon" for people to use and sell narcotics at University Commons. Id. at 10:8–13. Later, however, Morgan testified that the drug activity at University Commons was not

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

"exceptionally higher than any other apartment complex in Morgantown[.]" Id. at 26:1-3. The record does not support a finding that drug activity was more likely to occur at University Commons than at any other apartment complex. Even if the record supported a finding that University Commons was a high crime area, it would not automatically create reasonable suspicion. The finding would be "among the relevant contextual considerations" but not enough, on its own, "to support a reasonable, particularized suspicion of criminal activity." See Wardlow, 528 U.S. at 119, 124 (citations omitted). The Court finds that the alleged prevalence of drug activity at University Commons is not supported in the record, and if it were, it would not, on its own, create reasonable suspicion.

    **3.  Truck's Presence at University Commons**

To the extent the Government argues that the truck's presence in the University Commons parking lot created reasonable suspicion, the Court rejects this argument as well. When pressed by the Magistrate Judge about why he removed Defendant from the truck, Morgan testified, "I just — it was just with the — the location of the vehicle, the interior of the vehicle. Just he — he — it — everything just seemed out of place, your Honor." Transcript, ECF No. 53, at 17:12-20. Continuing in response to

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

the question, Morgan cited "the type of vehicle in the area," stating that it was an "older, beat-up vehicle" and that "it's common for the suspicious activities for that area, those — those sort of vehicles," noting that the apartments are "fairly expensive apartments." Id. at 18:8-22. Morgan did not sufficiently explain why the truck's presence in the University Commons parking lot would create reasonable suspicion such that Morgan could order Defendant to exit his truck. The truck's presence, alone, did not create reasonable suspicion.

### 4.    Resistance or Suspicious Acts by Defendant

To the extent the Government argues that Defendant's behavior upon waking created reasonable suspicion, the Court rejects this argument as well. For instance, the Government argues that Morgan knocked on the door numerous times before Defendant became aware of his presence. It argues that Defendant was resistant to Morgan's request to exit the truck. The Government also argues that it was suspicious for Defendant, immediately upon waking, to ask what he did wrong. Finally, it argues that Defendant shoved something in his pocket while he was still in the truck. The Court finds that all of these facts, even if true, did not create reasonable suspicion. Rather, they naturally flowed from the fact that Defendant was abruptly and tersely awoken from sleep.

USA V. RICHIE                                               1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Defendant's alleged actions upon waking do not, on their own, create reasonable suspicion.

### 5. Totality of the Circumstances

Considering the totality of the circumstances here, as the Court must, the Government has not met its burden to show that reasonable suspicion existed. Defendant had just woken from sleep. When he woke, he did not appear to be under the influence of drugs or alcohol. Moreover, Morgan never stated — in his report, testimony, or otherwise — that Defendant exhibited any other indicia of impairment, such as slurred speech, dilated pupils, glassy eyes, etc. Morgan never reported that he smelled or saw controlled substances before ordering Defendant out of the truck. Morgan testified that he believed he "had seen something on the seat" but admitted that he was "not sure." Id. at 13:1. To the extent that Defendant asked questions or protested, the Court attributes the questions and comments to the shock of being awoken by a uniformed officer. Morgan's lack of reasonable suspicion was summed up well during the suppression hearing when he was asked, "So what did you think was going on?" He responded, "I really — honestly, I didn't know." Id. at 10:19-20. Morgan's justification for ordering Defendant to exit the truck was more akin to a "hunch" than an articulable set of facts. Based on the

USA V. RICHIE                                                          1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

totality of the circumstances, the Court finds that Morgan lacked the requisite reasonable suspicion to seize Defendant by ordering him to exit his truck.

B.   **Defendant's incriminating statements would not otherwise be suppressed for a failure to provide Miranda warnings because Defendant was either not in custody or not being interrogated when the statements were made.**

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In order to protect this right, the Supreme Court held in Miranda v. Arizona that the prosecution may not use statements stemming from custodial interrogations of a suspect unless the prosecution demonstrates that it has used certain procedural safeguards. 384 U.S. 436, 478-79 (1966). The procedural safeguards include informing the suspect that he has the right to remain silent, that anything he says may be used as evidence against him, and that he has a right to the presence of an attorney. Id. at 444. A suspect may waive these rights, as long as the "waiver is made voluntarily, knowingly and intelligently." Id. To violate Miranda, law enforcement must obtain a statement — without using safeguards — from a suspect while he was (1) in custody and (2) being interrogated.

Whether a suspect is in custody for Miranda purposes depends on whether his "freedom of action is curtailed to a 'degree

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (citation omitted). An individual is not in custody for Miranda purposes simply because he is detained and not free to leave. United States v. Sullivan, 138 F.3d 126, 130-31 (4th Cir. 1998). The Fourth Circuit has held that handcuffs, in and of themselves, do not establish involuntariness of a suspect's statements. See United States v. Seni, 662 F.2d 277, 281 (4th Cir. 1981). An officer may temporarily handcuff a suspect during a traffic stop for the officer's safety, without triggering a Miranda requirement, as long as the restriction lasts only long enough to verify suspicions of illegal activity. United States v. Donaldson-Pinilla, 292 F. App'x 217, 218-20 (4th Cir. 2008) (per curiam). Even "drawing weapons, . . . placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." United States v. Sullivan, 138 F.3d 126, 132 (4th Cir. 1998) (citation omitted).

An interrogation has taken place when police officers engaged in "words or actions . . . that they should have known were reasonably likely to elicit an incriminating response" from the suspect. Rhode Island v. Innis, 446 U.S. 291, 302 (1980). "Miranda was intended to protect suspects from coercive police

21

USA V. RICHIE                                              1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

practices, not render officers mute." United States v. Johnson, 734 F.3d 270, 277 (4th Cir. 2013).

Here, Defendant's motion does not quote the specific statements he seeks to suppress. Rather, he generally refers to his "statements about the drugs on his person" and his statements "regarding the firearms located in the vehicle." The Government concedes in its objections that Defendant was in custody for Miranda purposes after the moment when Morgan put Defendant in the cruiser and closed the door. Accordingly, the Government concedes that Defendant was in custody for Miranda purposes when Morgan asked him about the fentanyl. The Government, however, contends that Defendant's statements about fentanyl are irrelevant to the case and would not be elicited at trial. Because the Government does not intend to introduce them, the Court will not address the admissibility of the statements relating to fentanyl.

As discussed, Morgan lacked the requisite reasonable suspicion to order Defendant to exit the truck. The Court, however, finds that the incriminatory statements relating to firearms would not otherwise be suppressed for failure to provide Miranda warnings. Based on the Court's findings of fact, the Court believes the following statements are at issue: (1) Defendant's statements that his "buddy's pistol's in the truck" and,

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

specifically, on the "front seat"; (2) Defendant's statement that he is a "felon already" and that somebody left the pistol in the truck; (3) Defendant's statement that the pistol was "on the front passenger seat"; and (4) Defendant's statement that an AR-15 was in the truck. The Court will assess each in turn.

First, the Court finds that Defendant was not in custody for Miranda purposes when he stated that his "buddy's pistol's in the truck" and, specifically, on the "front seat." At this point, Defendant had just been removed from the truck, and Morgan was asking him questions related to officer safety. Morgan asked him, "Do you have anything on you?" Defendant responded that he had a "knife and a pistol clip." Morgan proceeded to conduct a pat-down of Defendant, and while patting him down, he asked Defendant, "What do you have a magazine for?" Defendant replied, "My buddy's pistol's in the truck." Morgan asked him where the pistol was, and Defendant said that it was on the "front seat." Defendant was not handcuffed at this point, and he had not been told that he was detained. His freedom of association was not "curtailed to a degree associated with formal arrest." Accordingly, he was not in custody for purposes of Miranda, and these statements would not be excluded based on the failure to give Miranda warnings.

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Second, Defendant volunteered the statement, "The pistol, man. I'm a felon already, dude. Somebody left it in my truck." This spontaneous utterance was not in response to any police questioning. Morgan was looking at Defendant's prison ID when Defendant made the statement. Because the statement was not provided in response to interrogation, it would not be excluded based on the failure to give Miranda warnings.

Third, Defendant was not in custody for Miranda purposes when he stated for the second time that the firearm was "on the front passenger seat." Defendant made this statement in response to the question, "Where is the firearm at?" Morgan was still in the process of asking questions with respect to his safety, which included, of course, locating the firearm. Accordingly, Defendant was not in custody for purposes of Miranda, and this second statement regarding the pistol's location would not be suppressed for failure to provide Miranda warnings.

Fourth and finally, Defendant spontaneously volunteered his statement regarding the AR-15. Morgan had opened the cruiser door and said, "What's up?" In response, Defendant said, "There's an AR-15 in that backpack that belongs to a woman up in Preston County. Her son sold it to me, and I was gonna give it back to her. She was gonna buy it from me." Morgan's innocuous question

24

USA V. RICHIE                                                      1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

("What's up?") would not be expected — by anyone — to elicit an incriminating response. Defendant volunteered the information. Accordingly, the statement regarding the AR-15 was not provided in response to interrogation and would not be suppressed based on the failure to give <u>Miranda</u> warnings. Overall, none of the statements regarding the firearms at issue were made in response to coercive police practices in violation of <u>Miranda</u>.

**C.  Because Defendant informed Morgan that Defendant had a knife on his person, Morgan would have been entitled to conduct a pat-down of Defendant for Morgan's safety.**

If Morgan had lawfully ordered Defendant out of the truck (he did not), then Morgan's pat-down would have been proper. During a valid stop, if an officer reasonably believes that an individual may be "armed and dangerous," the officer is entitled to frisk the individual for weapons. <u>Terry</u>, 392 U.S. at 27. "The reasonableness of the search is measured objectively. If a reasonably prudent person would believe that his safety, or the safety of others, is endangered, he may conduct a limited search of outer clothing to discover any weapons." <u>United States v. Raymond</u>, 152 F.3d 309, 312 (4th Cir. 1998) (citation omitted). The Fourth Circuit has found that the terms "armed" and "dangerous" are linked such that when a suspect is armed, there is no additional "dangerousness" requirement. <u>See</u> <u>United States v.</u>

25

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Robinson, 846 F.3d 694, 700 (4th Cir. 2017) (reasoning that a suspect was "armed and thus presented a threat to the officer's safety").  In other words, in this context, to be armed is to be dangerous.  Here, because Defendant told Morgan that he had a knife on his person, Morgan would have been entitled to pat Defendant down for his safety.

**D.    Because the Court finds a need to deter the police conduct at issue, and there is no evidence in the record to support application of the inevitable-discovery doctrine, the exclusionary rule applies.**

"Derivative evidence, or 'fruit of the poisonous tree,' is evidence that 'has been come at by exploitation of [an] illegality . . . instead [of] means sufficiently distinguishable to be purged of the primary taint.'"  United States v. Lentz, 524 F.3d 501, 522 (4th Cir. 2008) (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)).  Here, given that it was unlawful to order Defendant out of the truck, all evidence seized after that point in time is derivative evidence, or fruit of the poisonous tree.  Having found the initial seizure unconstitutional and the evidence at issue unlawfully obtained, the Court must assess whether application of the exclusionary rule is warranted under the specific circumstances of this case.

The Supreme Court created the exclusionary rule "to safeguard against future violations of Fourth Amendment rights through the

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

rule's general deterrent effect." Arizona v. Evans, 514 U.S. 1, 10 (1995) (citations omitted).  The exclusionary rule "generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights," Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 359 (1998), but the "sole purpose" of the rule "is to deter future Fourth Amendment violations," Davis v. United States, 564 U.S. 229, 236-37 (2011), and its application "properly has been restricted to those situations in which its remedial purpose is effectively advanced." Illinois v. Krull, 480 U.S. 340, 347 (1987).  As the Supreme Court has made clear, the exclusionary rule is not a "strict-liability regime," Davis, 564 U.S. at 240, and suppression of evidence "has always been [the] last resort, not [the] first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006).

As United States District Judge Irene M. Keeley observed,

> The exclusionary rule is a drastic remedy that exacts a high social cost. See Nix v. Williams, 467 U.S. 431, 442, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); Rakas v. Illinois, 439 U.S. 128, 137, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (recognizing that "[e]ach time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights.").  "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free — something that 'offends basic concepts of the criminal justice system.'" Herring v. U.S., 555 U.S. 135, 141,

27

USA V. RICHIE                                                          1:24-CR-51

### MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]

> 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (quoting Leon, 468 U.S. at 908, 104 S.Ct. 3405). Consequently, defendants seeking to invoke the exclusionary rule face a "high obstacle" due to "the rule's costly toll upon truth-seeking and law enforcement objectives." Id. (quoting Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 364-65, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)). The paramount purpose of the exclusionary rule is deterrence; ultimately, courts should only apply the exclusionary rule when "the benefits of deterrence [ ] outweigh the costs." Id. (citing Leon, 468 U.S. at 910, 104 S.Ct. 3405).

United States v. Lough, 221 F. Supp. 3d 770, 780 (N.D.W. Va. 2016), aff'd, 721 F. App'x 291 (4th Cir. 2018). "Exclusion exacts a heavy toll on both the judicial system and society at large" because it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." Davis, 564 U.S. at 237.

For the exclusionary rule "to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Id. "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." Id. at 240 (citation and internal punctuation omitted).

USA V. RICHIE                                                          1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

"When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Id. at 238 (citations and internal punctuation omitted). "[T]he deterrent effect of the exclusionary rule must be judged at the point of the constitutional violation, and the culpability of the actors involved then. The pertinent inquiry is whether we apply the exclusionary rule to keep similar violations from happening again . . . ." Id. at 253.

Here, the need for deterrence is evidenced by Morgan's own testimony during the suppression hearing. Despite Morgan's inability to articulate the criminal conduct he thought was afoot when he ordered Defendant to exit the truck, he testified as follows:

> THE COURT: Okay. So — so would you always order someone, a hundred percent of the time, in every case, out of the vehicle?
>
> THE WITNESS: I'm going — I'm not going to say a hundred percent of the time, but probably 95 percent-plus times I'm going to have them exit the vehicle so I can, you know, kind of get an idea of what's going on, of why they're there. You know, it — it keeps them from having the opportunity, if necessary, to — you know, to grab a weapon. I can have them standing, you know, outside their vehicle. It doesn't have to be completely away, but I can have them outside their vehicle so I can talk to them and . . . kind of find out what's going on,

USA V. RICHIE                                                  1:24-CR-51

### MEMORANDUM OPINION AND ORDER ADOPTING IN PART
### AND REJECTING IN PART REPORT AND RECOMMENDATION
### [ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]

> why they're — you know, why they're back here
> and in the area that they were in . . . .

Transcript, ECF No. 53, at 20:22-21:12.  The act of ordering Defendant out of his vehicle could seem too trivial and insufficient to warrant application of the exclusionary rule, but the act was undertaken without a constitutional basis.  A well-trained officer should know that ordering an individual to exit his vehicle, on private property, without any articulable reasonable suspicion of criminal activity, is impermissible under the Fourth Amendment.  Deterring such investigatory tactics is worth the cost of excluding evidence here.

An exception to the exclusionary rule is the inevitable-discovery doctrine.  The inevitable-discovery doctrine "allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have ultimately or inevitably discovered the evidence by lawful means."  United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017) (citations and internal quotation marks omitted).  The prosecution must prove by a preponderance of the evidence that (1) the police legally could have uncovered the evidence, and (2) the police would have done so.  United States v. Allen, 159 F.3d 832, 840 (4th Cir. 1998).  The Government has not met its burden here.

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

The Government argues that Morgan inevitably would have noticed that the license plate on Defendant's truck was invalid and begun an investigation, such that the evidence at issue would have been obtained regardless. The Government, however, has produced no evidence to show that Morgan would have realized that the license plate was invalid if he never directed Defendant to exit the truck. For example, the Government has not produced evidence of a policy or routine procedure that would entail Morgan's running a license plate in the context of a welfare check. Accordingly, the inevitable-discovery doctrine does not apply.

### V.    CONCLUSION

For the reasons discussed above, the R&R is **ADOPTED IN PART** and **REJECTED IN PART** [ECF No. 49]. Morgan lacked the requisite reasonable suspicion to order Defendant to exit the truck. Had the initial seizure been lawful (it was not), Defendant's statements regarding the firearms in the vehicle would not otherwise be suppressed. Accordingly, the R&R is **ADOPTED IN PART**, to the extent that it is consistent with this Memorandum Opinion and Order, and it is **REJECTED IN PART**, to the extent that it is not. Likewise, with respect to the Government's objections, the objections are **OVERRULED** with respect to the Magistrate Judge's finding that the initial seizure was unlawful, but the objections

USA V. RICHIE                                                    1:24-CR-51

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 49] AND GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

are **SUSTAINED** with respect to the Magistrate Judge's finding that

Defendant's statements were otherwise inadmissible under <u>Miranda</u>.

Defendant's motion to suppress is **GRANTED** [ECF No. 38].  At trial,

the Government may not introduce any of the evidence seized, or

statements made, during Defendant's encounter with law enforcement

on September 24, 2023.

It is so **ORDERED.**

The Clerk is **DIRECTED** to transmit copies of this Memorandum

Opinion and Order to counsel of record.

DATED: July 7, 2025

_____
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA